UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| KEITH A. WARREN,<br><br>    Plaintiff<br><br>v.<br><br>NEVADA DEPARTMENT OF CORRECTIONS, et. al.,<br><br>    Defendants | Case No.: 3:17-cv-00228-MMD-WGC<br><br>**Report & Recommendation of United States Magistrate Judge**<br><br>Re: ECF No. 226 |

This Report and Recommendation is made to the Honorable Miranda M. Du, Chief United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR 1B 1-4.

Before the court is Defendants' Motion for Summary Judgment. (ECF Nos. 226, 227.) Plaintiff filed a response. (ECF Nos. 230, 230-1 to 230-3.) Defendants filed a reply. (ECF No. 234.)

After a thorough review, it is recommended that the motion be granted in part and denied in part.

**I. BACKGROUND**

Plaintiff is an inmate in the custody of the Nevada Department of Corrections (NDOC), proceeding pro se with this action pursuant to 42 U.S.C. § 1983. (Second Amended Complaint (SAC) ECF No. 49.) The events giving rise to this action took place while Plaintiff was housed at Warm Springs Correctional Center (WSCC). (*Id.*)

The court screened Plaintiff's SAC and allowed him to proceed with: Eighth Amendment failure to protect claims against Luis Ramirez, Stephen Powers, Quentin Byrne, Chandra

Thomas, Ruben Vidaurri, Sheryl Foster and Joshua Kelly, as well as a retaliation claim against Thomas in Count I; and a retaliation claim against Powers, Vidaurri, Kelly and Thomas in Count II. (ECF Nos. 46, 48.) Thomas and Ramirez were subsequently dismissed without prejudice for failure to timely serve them under Federal Rule of Civil Procedure 4(m). (ECF No. 92.) Therefore, the action is proceeding with the Eighth Amendment failure to protect claim against Powers, Byrne, Vidaurri, Foster and Kelly in Count I, as well as the retaliation claim against Powers, Vidaurri and Kelly in Count II.

The Eighth Amendment failure to protect claim against Powers, Byrne, Vidaurri, Foster and Kelly in Count I is based on allegations concerning Norteño gang members at WSCC.[1] Plaintiff alleges that Powers informed the Norteños that Plaintiff was a sex offender, pedophile and baby killer. Plaintiff reported this to Byrne (and Thomas) in kites, but the kites went unanswered. Plaintiff also told Vidaurri, who said he would speak to the Norteños to try and find a resolution. Instead, Plaintiff was approached by a Norteño who goes by "Scrappy," who threatened Plaintiff with harm if he did not pay the Norteños to stay at WSCC. Plaintiff told Vidaurri about what Scrappy said, and Vidaurri told Plaintiff to just pay Scrappy. Plaintiff filed a grievance to Byrne and then Foster about Thomas failing to protect him, which was denied with no investigation. He reiterated his complaints about the threats from the Norteños to Vidaurri, who told Plaintiff he had better things to worry about. He avers that Kelly twice opened the door to let the Norteños into Plaintiff's cell to attack him. After the first attack, Plaintiff claims that Powers and Thomas told Scrappy that Plaintiff had been informing on them, and Plaintiff was attacked again.

---

[1] The Norteños are a violent prison gang based primarily in Northern Nevada and Northern California. (Widmar Decl., ECF No. 226 at 6 ¶ 11.)

The retaliation claim against Powers, Vidaurri and Kelly in Count II is based on allegations that between December 1, 2014, and November 6, 2015, Plaintiff submitted grievances and kites against Powers, Vidaurri, Kelly. He claims that as a result, they retaliated against him by inflaming the Norteños by telling them he was a pedophile, sex offender and baby killer, who was snitching on them. He further contends that they made the gang members attack him in retaliation for filing the grievances that specifically reported their failure to protect him.

Defendants move for summary judgment, arguing that Plaintiff's assault was due to a dispute between Plaintiff and members of the Norteños gang, and there is no evidence that prison staff knew of any ongoing issues between Plaintiff and the Norteños. They further contend that in discovery, Plaintiff refused to identify when Defendants allegedly disclosed his conduct to the Norteños, or whom he told.

## **II. LEGAL STANDARD**

The legal standard governing this motion is well settled: a party is entitled to summary judgment when "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Cartrett*, 477 U.S. 317, 330 (1986) (citing Fed. R. Civ. P. 56(c)). An issue is "genuine" if the evidence would permit a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A fact is "material" if it could affect the outcome of the case. *Id*. at 248 (disputes over facts that might affect the outcome will preclude summary judgment, but factual disputes which are irrelevant or unnecessary are not considered). On the other hand, where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *Anderson*, 477 U.S. at 250.

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994) (citation omitted); *see also Celotex,* 477 U.S. at 323-24 (purpose of summary judgment is "to isolate and dispose of factually unsupported claims"); *Anderson,* 477 U.S. at 252 (purpose of summary judgment is to determine whether a case "is so one-sided that one party must prevail as a matter of law"). In considering a motion for summary judgment, all reasonable inferences are drawn in the light most favorable to the non-moving party. *In re Slatkin*, 525 F.3d 805, 810 (9th Cir. 2008) (citation omitted); *Kaiser Cement Corp. v. Fischbach & Moore Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986). That being said, "if the evidence of the nonmoving party "is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249-250 (citations omitted). The court's function is not to weigh the evidence and determine the truth or to make credibility determinations. *Celotex,* 477 U.S. at 249, 255; *Anderson*, 477 U.S. at 249.

In deciding a motion for summary judgment, the court applies a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, 'it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.'… In such a case, the moving party has the initial burden of establishing the absence of a genuine [dispute] of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rest., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal citations omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving

party cannot establish an element essential to that party's case on which that party will have the burden of proof at trial. *See Celotex Corp. v. Cartrett*, 477 U.S. 317, 323-25 (1986).

If the moving party satisfies its initial burden, the burden shifts to the opposing party to establish that a genuine dispute exists as to a material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party need not establish a genuine dispute of material fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (quotation marks and citation omitted). The nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *Matsushita*, 475 U.S. at 587. Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine dispute of material fact for trial. *Celotex*, 477 U.S. at 324.

### III. DISCUSSION

**A. Failure to Protect**

    **1. Standard**

Under the Eighth Amendment, prison conditions should not "involve the wanton and unnecessary infliction of pain" or be "grossly disproportionate to the severity of the crime warranting imprisonment." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). Although prison conditions may be, and often are, restrictive and harsh, prison officials "must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)(quoting *Hudson v. Palmer*, 486 U.S. 517, 526-27 (1984)).

"[P]rison officials have a duty...to protect prisoners from violence at the hands of other prisoners." *Farmer*, 511 U.S. at 833 (citations and quotations omitted); *see also Cortez v. Skol*, 776 F.3d 1046, 1050 (9th Cir.2015) (citing *Farmer*, 511 U.S. at 833). "Having incarcerated 'persons [with] demonstrated proclivit[ies] for antisocial criminal, and often violent, conduct,' having stripped them of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course." *Farmer*, 511 U.S. at 833 (internal citations omitted). "Being violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.'" *Id*. at 834 (citing *Rhodes*, 452 U.S. at 347).

To establish a violation of this duty, the prisoner must establish that prison officials were "deliberately indifferent" to serious threats to the inmate's safety. *Farmer*, 511 U.S. at 834; *see also Labatad v. Corrections Corp. of America*, 714F.3d 1155, 1160 (9th Cir. 2013) (citing *Gibson v. County of Washoe*, 290 F.3d 1175, 1187 (9th Cir. 2002)). Under the deliberate indifference standard, a violation of the Eighth Amendment is only found when an objective and subjective component are met. *See Farmer*, 511 U.S. at 834; *Labatad*, 714F.3d at 1160.

First, "the deprivation alleged must be, objectively, sufficiently serious...; a prison official's act or omission must result in the denial of 'the minimal civilized measures of life's necessities.'" *Farmer*, 511 U.S. at 834 (citations and quotations omitted). When a plaintiff claims prison officials failed to take reasonable steps to protect, the plaintiff must show that "he is incarcerated under conditions posing a substantial risk of serious harm." *Id*. (citations omitted).

Second, the inmate must satisfy the subjective element. This means that the prison official must "know of and disregard an excessive risk to inmate health or safety; the official

6

must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. "Mere negligence is not sufficient to establish liability." *Frost v. Agnos*, 152 F.3d 1124, 1128 (9th Cir. 1998). "Liability may only follow if a prison official 'knows that inmates face a substantial risk of serious harm and disregard that risk by failing to take reasonable measures to abate it.'" *Labatad*, 714 F.3d at 1160 (quoting *Farmer*, 511 U.S. at 847).

**2. Analysis**

Preliminarily, Plaintiff's response includes arguments regarding his transfer from WSCC to SDCC in December of 2014, which concerns his allegation that Ramirez failed to protect him when Plaintiff filed an emergency grievance that he would not be safe at SDCC due to his status as a sex offender, and was subsequently attacked by Aryan Warriors gang members at SDCC. Ramirez has been dismissed; therefore, the court will not address these arguments. Plaintiff's response also contains many arguments about the conduct of caseworker Thomas. Thomas has also been dismissed; therefore, the court will not address these arguments.

Plaintiff further argues that the court should reject Defendants' motion because they present third-party statements without sworn declarations or affidavits. The court interprets Plaintiff's argument as asserting that Defendants improperly seek to introduce inadmissible hearsay to support their motion. Presumably, Plaintiff is referring to the statements made in the investigative reports following the December 7, 2015 incident. Vidaurri's report contains statements attributed to Plaintiff, which are not hearsay. Fed. R. Civ. P. 801(d)(2). Insofar as Plaintiff otherwise objects to the contents the investigative reports, they are admissible under Federal Rule of Evidence 803(6), which contains the business records exception to the hearsay rule.

Plaintiff also contends that Defendants concealed, destroyed, misplaced or otherwise refused to provide a video recording of the housing unit at the time of the incident, but he provides no *evidence* to support this claim.

The court will now turn to its analysis of the failure to protect claim against Powers, Byrne, Vidaurri, Foster and Kelly.

On October 25, 2015, Plaintiff was housed in Unit 4-B-64-A at WSCC, where he remained until December 7, 2015, when members of the Norteños gang assaulted Plaintiff in his cell. (ECF No. 227 at 14; ECF No. 227 at 23-34.)

There is an investigative report by Vidaurri, who was ordered to provide transport for Plaintiff to the infirmary and then to Carson Tahoe Hospital, where he interviewed Plaintiff. (ECF No. 337 at 14.) Plaintiff told Vidaurri that two weeks prior, an inmate made a mess in the Unit 4B showers/bathroom, and Plaintiff was the shower/bathroom porter. Plaintiff was upset, but was informed by a Mexican that he would clean it up. Plaintiff told Vidaurri that it was the same "little guy" who assaulted him. That inmate, later identified as Lopez, was a validated Norteño. Plaintiff cleaned the bathroom up anyway, but admitted to having some "choice words" towards the Norteños. Then, Plaintiff told Vidaurri that at approximately 6:00 a.m. on December 7, 2015, Plaintiff was hanging out on the tier[2] and getting ready for breakfast when Lopez came and struck him in the face with a closed fist. Plaintiff did not fight back, but looked at the inmate and walked away. He went back to his cell and spoke with his cellmate about what happened. A couple hours later, Lopez entered Plaintiff's cell with another inmate, while a third inmate served as a lookout (all were identified as validated Norteños) and began to attack

---

[2] The tier is an open area in front of the cell blocks where inmates often sit or stand when permitted to be out of their cells. (Widmar Decl., ECF No. 337 at 6 ¶ 8.)

Plaintiff with closed fists and a prison-made weapon. The attack lasted about a minute or so until Plaintiff was able to push them out of his cell. (*Id*. at 15.)

Kelly also completed an investigation report. Kelly states that at approximately 8:15 a.m., he was letting his unit out to pill call with the tier doors open. He let the inmates out of the south-side tier and then focused his attention on the north-side tier. Upon letting the north-side tier inmates out, he redirected his attention to the south-side and witnessed Plaintiff exit his cell covered in blood and Lopez was rushing away from the cell. Kelly immediately shut all the tier doors and announced on the radio that there was a fight. He ordered all the inmates to get on the ground. (*Id*. at 16.)

Jonathan Wilson (not a defendant) completed an investigation report. Wilson spoke with Plaintiff's cellmate, who relayed that Plaintiff had initially been assaulted at approximately 6:00 a.m., while sitting at the bottom of the stairs near the sally port. Plaintiff told his cellmate he had been punched or slapped on the side of his head. After returning from breakfast, inmates pushed past the cellmate and one of them told him to stay away because it did not involve him. The inmates entered Plaintiff's cell, and the cellmate heard Plaintiff cry out, and then heard a scuffle in the cell. The cellmate said he looked up to see that Kelly was responding. The cellmate said he did not know what prompted the assault, but the Norteños had been telling Plaintiff that he needed to stop attending Catholic services and other programs. The cellmate believed that this conflict with the Norteños related to Plaintiff's crimes. (*Id*.) Wilson goes on to state that institutional investigators later identified the motive as disrespect of the Norteños, mentioning the incident that had occurred with the bathroom on November 29, 2015. Finally, Wilson noted that after the 6:00 a.m. assault, Plaintiff reportedly made more disparaging comments to the Norteños. (*Id*. at 18.)

The inmates involved were convicted of gang activities and sanctioned to disciplinary segregation. (ECF No. 227 at 23-34.)

Defendants contend that plaintiff's institutional record or "I-File" reveals that no kites were submitted between January 2015 and December 2015 that discuss alleged threats to Plaintiff.[3] (ECF No. 227 at 50-56, 64-109.) They contend that Plaintiff's grievance history report similarly demonstrates he did not file any grievances alerting staff that the Norteños were threatening him. (ECF No. 227 at 111-164.) Defendants assert that instead, the Inspector General's investigation revealed that Plaintiff had been involved in an ongoing dispute with the Norteños over perceived disrespect of a gang member. (ECF No. 227 at 15-18.) Defendants argue there is no evidence that staff informed anyone of Plaintiff's status as a sex offender, pedophile, or baby killer, or that Plaintiff advised staff about the prior incident involving the Norteños in the bathroom.

The court will now address the claim with respect to each named defendant.

**Powers**

Plaintiff states that during a transfer to Lovelock Correctional Center (LCC), on September 28, 2013, Powers stated: "You don't remember me, I was your court bailiff and you should have killed yourself." (Pl. Decl., ECF No. 230-1 at 7 ¶ 3.)

In his declaration and in his responses to Plaintiff's discovery, Powers denies that he had such a conversation with Plaintiff, and asserts that he was never employed as a bailiff, did not work in the Eighth Judicial District Court and that he was working in Massachusetts at the time.

---

[3] The Declaration of Kirk Widmar, who is the associate warden at WSCC, states that the I-File contains the complete institutional records for an inmate and would include a copy of any non-medical kites submitted by an inmate. (Widmar Decl., ECF No. 227 at 6 ¶ 7.)

(Powers Decl., ECF No. 227 at 167 ¶¶ 17-18; ECF No. 230-1 at 157-159, response to RFAs 11-18, 20; ECF No. 230-3 at 50-51, response to RFAs 1, 2.)

In his response, Plaintiff provides no evidence that Powers was in fact working in the Eighth Judicial District Court in 1986 as a bailiff in his criminal proceeding.

Plaintiff asserts that after he arrived back at WSCC (in December of 2014), Powers began informing Norteños that Plaintiff was a sex offender, pedophile and baby killer. (Pl. Decl., ECF No. 230-1 at 10 ¶ 16.) Plaintiff states that he approached Powers about this issue, and Powers laughed and said, "I know!" and told Plaintiff he should go to his cell and kill himself. (*Id*.)

In support of his motion, Plaintiff submits Powers' responses to Plaintiff's discovery; however, the responses directly contradict Plaintiff's allegations.

Powers does not recall Plaintiff ever complaining to him about any of the issues alleged in the complaint. Nor does Powers recall Plaintiff ever submitting a kite or grievance addressed to Powers, and has no knowledge of a grievance filed by Plaintiff. (Powers Decl., ECF No. 227 at 167 ¶¶ 13-18.) Powers denies he informed STG members, including Scrappy, that Plaintiff was a sex offender. (ECF No. 230-1 at 155-156, response to RFAs 6, 7, 8; ECF No. 230-1 at 165, response to RFA 34.) He further denies that Plaintiff confronted him about spreading this information to Norteños. (ECF No. 230-1 at 156, response to RFA 9.) He denies that he informed Scrappy to attack Plaintiff due to his status as a sex offender. (ECF No. 230-1 at 162, response to RFA 25.) Powers denies that he informed the Norteños on December 7, 2015, that Plaintiff had been "informing on them.". (ECF No. 230-1 at 169-179, response to RFAs 49, 50.) Powers denies that he threatened the Norteños that they would be kicked out of WSCC unless they beat Plaintiff. (ECF No. 230-1 at 170, response to RFA 51.) Powers also denies that he ordered Kelly to open Plaintiff's cell door so that the Norteños could assault him on December 7, 2015. (ECF

1  No. 230-1 at 171, response to RFA 54.) Powers denies that Plaintiff submitted kites against him
2  for putting his safety at risk with the Norteños. (ECF No. 230-1 at 162-164, response to RFAs
3  26, 28, 32.) He denies that anyone at WSCC ever talked to him about kites and grievances filed
4  against him by Plaintiff. (ECF No. 230-1 at 52, response to RFA 5.)

5  While Powers denies having any of these conversations with Plaintiff or Scrappy and
6  denies he told the Norteños about Plaintiff's crimes, Plaintiff states in his declaration that he
7  approached Powers about this issue and Powers laughed and said, "I know!" and told Plaintiff he
8  should go to his cell and kill himself. A factfinder presented with Plaintiff's version of events
9  could conclude that Powers knew of and disregarded a risk to Plaintiff's safety. Therefore,
10 summary judgment should be denied as to the failure to protect claim against Powers in Count I.

11 ***Kelly***

12 Kelly's report does not mention the 6:00 a.m. assault, but states that approximately two
13 hours later he was letting the inmates out to pill call and when he re-directed his attention to the
14 south-side he saw Plaintiff exit his cell covered in blood. At that point, Kelly immediately shut
15 the tier doors and called for officers to respond.

16 Plaintiff states that on December 7, 2015, at around 6:00 a.m., Kelly opened his cell door
17 for tier/breakfast. Plaintiff went downstairs and stood by the staircase near the rear sally port
18 doors. A few minutes later, he was hit from behind on his right temple area. Plaintiff decided to
19 go up to his cell to see if he was alright. Kelly then came over the intercom to ask Plaintiff if he
20 was okay. Plaintiff said, "I believe so." (Pl. Decl., ECF No. 230-1 at 11 ¶ 21.)

21 At around 8:00, Kelly was doing door call for the unit cells. Plaintiff states that six
22 Norteños were posted up around the tier, and two of them were directly in front of Plaintiff's cell
23 door, blocking him from escaping. Plaintiff states that he screamed for help. Kelly then

announced door call for the second time. The two inmates in front of his cell rushed in and began to attack Plaintiff. (Pl. Decl., ECF No. 230-1 at 12 ¶ 23.)

Plaintiff has presented a genuine dispute of material fact as to whether Kelly knew of and disregarded a risk to Plaintiff's safety. Plaintiff claims that Kelly checked in with him after the first assault to see if he was okay, and then hours later would have been aware of the Norteños standing in front of Plaintiff's cell and of Plaintiff's screams for help. If a fact finder believes Plaintiff's version of events, he or she could conclude that Kelly knew of and disregarded a risk to Plaintiff's safety. Therefore, summary judgment should be denied as to Kelly with respect to the Eighth Amendment failure to protect claim.

*Vidaurri*

Defendants argue that Plaintiff filed no kites or grievances alerting staff about an issue with the Norteños. They further argue that the December 7, 2015 incident was the result of an issue of disrespect between Plaintiff and the Norteños.

Plaintiff claims that in May of 2015, he sent three kites to Vidaurri about Powers informing the Norteños he was a sex offender, baby killer and pedophile, and Vidaurri told Plaintiff he would speak to Scrappy to resolve the situation. Plaintiff was then approached by Scrappy and was threatened with physical harm if he did not pay to remain at WSCC. Plaintiff told Vidaurri about this, and Vidaurri told Plaintiff just to pay Scrappy. (Pl. Decl., ECF No. 230-1 at 11 ¶ 18.)

Plaintiff provides Vidaurri's discovery responses, where Vidaurri denies that he spoke to Plaintiff about Scrappy. (ECF No. 230-1 at 69-70, response to RFAs 40, 41, 43, 44, 45.) Vidaurri did admit in discovery that STG inmates such as the Norteños are known to dislike and to attack sex offenders within NDOC. (ECF No. 230-1 at 78, response to RFAs 18, 19.)

1    Plaintiff claims he has filed multiple grievances and kites about Vidaurri's failure to
2 protect him. (Pl. Decl., ECF No. 230-1 at 11 ¶ 20.) He provides three kites from May of 2015 on
3 this issue. The kites contain no response and have no stamp or staff signature indicating that the
4 kites were received. (ECF No. 230-3 at 34-36.)
5    Plaintiff also submits an informal level grievance dated November 4, 2015, that made a
6 complaint against Vidaurri regarding telling Vidaurri that Powers had been harassing him by
7 telling the Norteños that Plaintiff was a pedophile, sex offender and baby killer. (ECF No. 230-3
8 at 38-39.) The informal level grievance does not have an assigned grievance log number and is
9 not stamped or signed as received by any staff member. (*Id*.)
10   While it is unclear whether Plaintiff actually submitted the kites and grievances about
11 Vidaurri's failure to protect him, Plaintiff does state in his own declaration that he approached
12 Vidaurri about Powers informing Norteños about his crime, and Vidaurri said he would speak to
13 Scrappy. While Scrappy's statement would be inadmissible hearsay, Plaintiff's declaration states
14 that Vidaurri told Plaintiff just to pay Scrappy. Vidaurri disputes that Plaintiff spoke to him about
15 the issue with Powers, and maintains he did not speak to Scrappy about Plaintiff; however,
16 Plaintiff has sufficiently raised a genuine dispute of material fact as to whether Vidaurri knew of
17 and disregarded a risk to Plaintiff's safety. Therefore, summary judgment should be denied to
18 Vidaurri with respect to the Eighth Amendment failure to protect claim in Count I.

***Byrne***

20   Plaintiff's failure to protect claim against Byrne is based on allegations that Plaintiff
21 raised Powers' and Vidaurri's failure to protect him from the Norteños in kites and grievances
22 addressed to Byrne.

Defendants assert that Plaintiff's records show that he did not submit a kite or grievance on this issue. In his responses to Plaintiff's discovery, Byrne denied receiving such kites or grievances. (ECF No. 230-1 at 128-129, response to interrogatories 1-4; (ECF No. 230-1 at 145, response to RFAs 40, 41.) Byrne denied having intelligence that Plaintiff would be attacked by Norteños. (ECF No. 230-1 at 148, response to RFA 53.)

In his response, Plaintiff does not provide a kite or grievance that demonstrates it was submitted to Byrne and put Byrne on notice of the issue with the Norteños. Plaintiff provides two informal grievance forms where he complained about Vidaurri and Powers, however, there is no response to these grievances or even an indication that the grievance was submitted and received, let alone any evidence that *Byrne* received and reviewed the grievance. (*See* ECF No. 230-3 at 39-41.) Therefore, summary judgment should be granted in Byrne's favor with respect to the Eighth Amendment failure to protect claim.

***Foster***

Plaintiff's allegations against Foster are that Plaintiff filed a grievance to Foster about Thomas failing to protect him, which was denied with no investigation.

Again, Defendants provide evidence that Plaintiff did not complain about the issue with the Norteños in any kites or grievances.

Plaintiff does not point to any grievance where he raised this issue to Foster. Plaintiff does provide Foster's response to interrogatories where she was asked about grievances, but she states that she does not recall grievance 2006300974. (ECF No. 230-1 at 109.) In any event, grievance 2006-30-00974 was about a kite response which Thomas placed in Plaintiff's file where she claimed that if he continued to threaten her, she would proceed accordingly.

(ECF No. 230-3 at 96.) That grievance did not contain a complaint about a failure to protect him from the Norteños.

Therefore, summary judgment should be granted in Foster's favor with respect to the Eighth Amendment failure to protect claim.

**B. Retaliation**

**1. Legal Standard**

"Section 1983 provides a cause of action for prison inmates whose constitutionally protected activity has resulted in retaliatory action by prison officials." *Jones v. Williams*, 791 F.3d 1023, 1035 (9th Cir. 2015); *Pratt v. Rowland*, 65 F.3d 802, 806 (9th Cir. 1995). Such a claim consists of the following elements: "(1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Jones*, 791 F.3d at 1035 (quoting *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005).

"The First Amendment guarantees a prisoner a right to seek redress of grievances from prison authorities as well as a right of meaningful access to the courts." *Id*. (citing *Bradley v. Hall*, 64 F.3d 1276, 1279 (9th Cir. 1995)).

**2. Analysis**

The retaliation claim against Powers, Vidaurri and Kelly in Count II is based on allegations that between December 1, 2014 and November 6, 2015, Plaintiff submitted grievances and kites against Powers, Vidaurri, and Kelly. He claims that because he filed these kites and grievances, they retaliated against him by inflaming the Norteños and telling them he was a pedophile, sex offender and baby killer, who was snitching on them. He further contends

that they made the gang members attack him in retaliation for filing the grievances that specifically reported the failure to protect him.

Defendants provide evidence that there are no kites or grievances in Plaintiff's prison records about the issues he was having with the Norteños or complaints on this issue directed at any staff member.

Plaintiff states that he filed a grievance against Powers for informing the Norteños he was a sex offender, pedophile and baby killer. The informal level grievance is dated November 6, 2015 (ECF No. 230-3 at 40-41); however, it is not assigned a grievance log number, is not stamped or signed as received by prison officials, and does not appear in Plaintiff's inmate grievance history.

Plaintiff similarly states that he filed a grievance about Vidaurri, and sent kites to Vidaurri. Plaintiff submits an informal level grievance dated November 4, 2015 (ECF No. 230-3 at 39); however, it is not assigned a grievance log number, is not stamped or signed as received by prison officials and does not appear in Plaintiff's inmate grievance history. Plaintiff also provides three kites addressed to Vidaurri with dates in May of 2015, but once again, the kites are not signed or stamped as received by any staff member; there is no response to the kites; and they do not appear in Plaintiff's prison records. (ECF Nos. 230-3 at 34-36.)

There is no evidence in these kites or grievances that they were ever actually submitted and received by staff, and specifically, that Powers or Vidaurri *knew* that Plaintiff had filed grievances or kites against them so as to demonstrate that they retaliated against him *because of* his protected conduct.

Plaintiff does not point to any evidence that he filed a grievance or kite about Kelly or that Kelly knew Plaintiff had filed a grievance or kite and acted on December 7, 2015 *because of* Plaintiff's filing of kites or grievances.

Therefore, summary judgment should be granted in Defendants' favor as to the retaliation claim in Count II.

### IV. RECOMMENDATION

IT IS HEREBY RECOMMENDED that the District Judge enter an order **GRANTING IN PART AND DENYING IN PART** Defendants' motion for summary judgment (ECF No. 226) as follows:

(1) the motion should be **GRANTED** as to Byrne and Foster in Count I;

(2) the motion should be **DENIED** as to Powers, Vidaurri and Kelly in Count I; and

(3) the motion should be **GRANTED** as to Powers, Vidaurri and Kelly in Count II.

If this Report and Recommendation is adopted, this action will be proceeding only with the Eighth Amendment failure to protect claim in Count I against Powers, Vidaurri and Kelly.

The parties should be aware of the following:

1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C), specific written objections to this Report and Recommendation within fourteen days of being served with a copy of the Report and Recommendation. These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the district judge.

2. That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of judgment by the district court.

Dated: October 20, 2021

							*William G. Cobb*
							William G. Cobb
							United States Magistrate Judge